IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2021

## IN RE CAROLINE R., ET AL.

**Appeal from the Juvenile Court for Sevier County**
**Nos. 20-0188, 20-0189    Dwight E. Stokes, Judge**

_____

### No. E2021-00245-COA-R3-PT

_____

The trial court terminated a mother and father's parental rights to their children on the grounds of (1) abandonment by failure to establish a suitable home; (2) failure to manifest an ability and willingness to personally assume custody or financial responsibility; (3) persistence of conditions; and (4) substantial noncompliance with the permanency plan. The trial court also ruled that the termination ground of abandonment by failure to visit had been proven against the father. The trial court further found that termination of the mother and father's parental rights was in the children's best interest. We affirm the trial court's conclusion that clear and convincing evidence supports these grounds for termination. We also affirm the trial court's determination that the termination of the mother and father's parental rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

James R. Hickman, Jr., Sevierville, Tennessee, for the appellant, Sherry R.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Jerry L. R., Jr.

Herbert H. Slatery, III, Attorney General & Reporter, Andrée Blumstein, Solicitor General, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Wendy Gooch Patrick, Sevierville, Tennessee, Guardian *ad litem*.

**OPINION**

# I. BACKGROUND

Caroline R. and Brittany R. ("the children") were born in 2017 and 2018, respectively, during the marriage of Sherry R. ("Mother") and Jerry L. R., Jr. ("Father"). Together, Mother and Father have another child who is not in their custody. Likewise, Father does not have custody of his four other children. Mother does not have custody of her two other children.

The proceedings underlying this appeal began when the Tennessee Department of Children's Services ("DCS") received a referral for lack of supervision and environmental neglect. During an initial home visit on November 7, 2018, DCS case manager Jackie Strange observed the parents' mobile home to be exceedingly cluttered, teeming with trash, and infested with cockroaches. One child was sleeping in a swing because her pack and play was used for storage, and the other child was sleeping in a playpen overflowing with toys and clothing. Ms. Strange and Mother completed a "Safe Sleep" assessment. Mother agreed to clear the sleeping areas and to keep trash bagged and outside the home. The same month, DCS interviewed Kristen Gentry of the Sevier County Health Department. Ms. Gentry began providing social services to the family in 2017 when the children lived in the mobile home along with Mother, Father, Mother's parents, and Mother's sister. Ms. Gentry recalled that, despite her instruction, the lack of cleanliness had been an ongoing problem in the parents' home. During her last visit with the family, Ms. Gentry told Mother that she planned to call Ms. Strange to report concerns about the home environment.

By the time Ms. Strange and a colleague returned to the parents' home on November 29, 2018, the conditions had further deteriorated and the children still lacked a safe sleeping space. Later that day, DSC filed a petition for temporary legal custody alleging that the children were dependent and neglected but acknowledging that there had been no events of actual harm to either child. On November 29, 2018, the juvenile court ("trial court") ordered the children to be removed from the parents' home and placed into DCS's temporary legal custody. The trial court found that DCS made reasonable efforts to prevent the children's removal. The children were placed in the foster home of Christina M. and her husband in Sevier County, Tennessee.

Through counsel, Mother and Father waived the preliminary hearing. The trial court granted the parents supervised visitation with the children and ordered each to pay $50.00 per child for monthly child support. On December 11, 2018, Mother, Father, and DCS reviewed and signed the Criteria and Procedures for Termination of Parental Rights form. The same day, the parents and DCS created an initial permanency plan which

required them to: (1) obtain and maintain clean, safe, and appropriate housing; (2) prove their ability to maintain housing through a rental agreement or continued residency along with proof of consistent employment; (3) complete a parenting assessment, including a mental health evaluation, and comply with any recommendations; (4) work with the Youth Villages Pilot Program[1] referred by DCS to complete the permanency plan's steps; (5) attend supervised visits with the children twice monthly and supply needs such as clothing, food, and toys during the visits; (6) prove to DCS a legal source of income and notify DCS of changes in employment or income; and (7) have a reliable transportation plan and provide proof of registration, car insurance, and valid driver's licenses. At this time, Father worked at a tire shop in Sevierville and Mother worked at McDonald's. The initial permanency plan's goal was to return the children to the parents.

On January 9, 2019, Mother and Father "stipulate[d] to [the children's] dependency and neglect based on environmental issues in the home that include a roach infestation to the point that roaches were crawling on the children and the parents refused to address the situation." The trial court adjudicated the children dependent and neglected. The trial court found that the responsibilities set out in the permanency plan were reasonable, related to the goal of returning the children to the parents, related to remedying the conditions requiring foster care, and in the children's best interest.

After the children were removed from their custody, Mother and Father left the contaminated house that they shared with Mother's parents. They lived in the Days Inn for a couple of weeks, before moving into a studio apartment in a former hotel for two months. Then, the parents moved to a house that included beds, toys, and plenty of space for the children. It was not a perfect house, due to the lack of safety plugs, fire extinguishers, and smoke detectors, but it represented progress. The parents lived in this house from February through July of 2019 until they could no longer afford the $900.00 monthly rent. From April through July of 2019, Mother and Father completed parenting education through Youth Villages.

DCS revised the permanency plan on June 3, 2019. The parents' responsibilities remained substantially the same, save the additional requirement of proving that they had been treated for and were free from lice. At this time, the children remained in DCS's custody and lived in the foster home. DCS considered placing the children with Mother's sister, who is the custodian of Mother's two other children, but Mother's sister did not comply with the process. In July 2019, Father resigned from the tire shop and moved to South Carolina to live with his mother. Father then lived with a friend. After moving, Father did not stay in contact with DCS. Later that summer, Mother and Father

---

[1] Youth Villages assists parents to obtain resources for housing, parenting, and other needs.

separated. By the Fall of 2019, Mother also moved to South Carolina. In South Carolina, Mother lived with her cousin and then with her sister. Father obtained employment in South Carolina, but changed jobs twice thereafter. Mother worked for a construction company, McDonald's, and Wendy's. Her plans to purchase a trailer to place on a vacant lot did not materialize and she lost money on the deal. Although the loss was significant compared to her income, Mother was unconcerned about forfeiting the trailer money. The trial court ratified the revised permanency plan on September 25, 2019. The trial court found that Mother was in partial compliance with the plan because she had completed appropriate visits with the children but that she lacked housing and a transportation plan. The trial court found that Father was not substantially compliant with the plan because he lacked housing, a transportation plan, and income. Furthermore, Father had not visited the children since July 16, 2019.

Along with Mother, DCS revised the permanency plan on November 20, 2019, to add the requirements that the parents, with DCS's assistance, each undergo a full psychological assessment. By then, Father still had not visited the children and the plan noted that Mother was "very dependent on supervising persons to assist her with the children." Following Father's psychological assessment, the examiner identified Father's location in South Carolina as a possible obstacle to reunification with the children. Along with Mother and Father, DCS again revised the permanency plan in May 2020. The last two revised permanency plans were ratified by the trial court. Father visited the children on January 27, 2020.

On January 29, 2020, DCS petitioned to terminate the parental rights of Mother and Father to the children, alleging several statutory grounds against both parents. Father answered DCS's petition on February 27, 2020. As an affirmative defense, Father asserted that any failure to visit the children "was not intentional and does not rise to the level of abandonment." By May 2020, the parents were reconciled and living together with a friend. Mother answered the petition for termination of parental rights on July 28, 2020. In July 2020, Mother and Father returned to Tennessee and moved into a studio apartment in a former hotel, where they had lived once before. Father resumed his employment at the tire shop. On January 14, 2021, they leased a three-bedroom, one-bathroom apartment from the Sevierville Housing Authority, intending to live there with the children. The rent was $545.00 monthly.

After two continuances due, in part, to the COVID-19 pandemic, the case proceeded to trial on February 5, 2021. Mother, Father, DCS family service worker Amanda Evans, DCS family service worker Katie Grubaugh, then-Sevier County Health

Department case manager Kristen Gentry, and the foster mother testified.[2] The children were then two and three years old, and a guardian *ad litem* represented their interests.

By order entered February 15, 2021, the trial court found clear and convincing evidence of the following grounds for termination of Mother and Father's parental rights: (1) abandonment by failure to establish a suitable home; (2) failure to manifest an ability and willingness to personally assume custody or financial responsibility; (3) persistence of conditions; and (4) substantial noncompliance with the permanency plan. As to Father, the trial court found clear and convincing evidence of an additional ground for termination: abandonment by failure to visit.[3] The trial court also determined that termination of Mother and Father's parental rights was in the best interest of the children. Mother and Father appealed.

## II. ISSUES

We consolidate and restate the issues on appeal as follows:

A. Whether clear and convincing evidence supports the trial court's findings of the statutory grounds for termination.

B. Whether clear and convincing evidence supports the trial court's findings that termination of Mother and Father's parental rights was in the best interest of the children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. §

---

[2] The testimony will be discussed in greater detail below as relevant to the issues on appeal.

[3] The trial court found that DCS failed to prove Mother's abandonment by failure to visit and that DCS failed to prove Mother and Father's abandonment by failure to support. DCS does not challenge these findings on appeal.

36-1-113(I)(1)).  "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'"  *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds.  *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).  Due process requires clear and convincing evidence of the existence of the grounds for termination.  *In re Drinnon*, 776 S.W.2d at 97.  A parent's rights may be terminated only upon:

(1)     [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c).  "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest."  *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights.  *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions.  *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence."  *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted).  It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established.  *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d).  Under

Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W. 3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV. DISCUSSION[4]

### A.

As stated above, the trial court granted DCS's termination petition against both parents based upon the following statutory grounds: (1) abandonment by failure to establish a suitable home; (2) failure to manifest an ability and willingness to personally assume custody or financial responsibility; (3) persistence of conditions; and (4) substantial noncompliance with the permanency plan. As to Father, the trial court found clear and convincing evidence of the additional ground of abandonment by failure to visit. We will discuss each ground in turn.

---

[4] We will reference the statutes which were in effect when DCS filed the petition for termination of parental rights on January 29, 2020.

*Abandonment by Failure to Establish a Suitable Home*

A parent may be found to have abandoned his or her child by failing to establish a suitable home. Tenn. Code Ann. § 36-1-113(g)(1). This ground for the termination of parental rights is established when:

> (a)  The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

> (b)  The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

> (c)  For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). This ground for termination requires DCS to make reasonable efforts to assist a parent in obtaining a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn. 2015). Although the statute requires DCS to make reasonable efforts toward the establishment of a suitable home for "a period of four (4) months following the physical removal" of the children, "the statute does not limit the court's inquiry to a period of four months immediately following the removal." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3

(Tenn. Ct. App. Nov. 29, 2007)). It requires a "safe and stable environment in which a child can live and 'the presence of a care giver who can supply the care and attention a child needs.'" *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017) (quoting *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015)) (citation omitted).

The children were removed from Mother and Father because of terrible environmental conditions. The trial court found that reasonable efforts were made to prevent their removal from the home. The record is replete with DCS's efforts to assist both parents in establishing a suitable home for the children. These included helping Mother to complete Sevier County Housing Authority applications, implementing the Youth Villages Pilot Program into the parents' home, sponsoring homemaker services for them, and twice helping the parents complete budgets.

Here, DCS's efforts to assist Mother and Father exceeded their own efforts to establish a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) ("The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]"). This is not to say that Mother and Father's efforts such as participating in homemaker services and applying for suitable housing were unnoticed. However, the evidence does not preponderate against the trial court's finding that the parents "have never shown that they could maintain safe and stable housing." Each parent testified that he or she moved among various addresses in Tennessee and South Carolina. Since the children's removal, Mother and Father uprooted multiple times and spent short periods of time in temporary accommodations, often with other people. Each parent testified that six months (February through July of 2019) was the longest he or she had lived in one place since the children's removal. Mother testified that they left this home because the landlord did not approve of various alterations they were making to it. In contrast, Ms. Grubaugh recalled Mother's statement that she and Father moved out because they could not afford that home's $900.00 monthly rent and were behind on payments. The trial court credited Ms. Grubaugh's testimony on this point. The evidence shows that several months after Mother applied for public housing with Ms. Grubaugh's help in 2019, a unit became available. At the time, Mother lacked stable housing in South Carolina, but she did not take advantage of the housing unit offered to her.

On appeal, the parents emphasize that they finally secured a three-bedroom apartment suitable for the children three weeks before trial. They point to Ms.

Grubaugh's testimony affirming that the apartment was suitable for the children.[5] However, the record corroborates the trial court's concern about the parents' ability to maintain the apartment long-term, "considering the current budget of the family, which left out child support payments and a vehicle payment." At trial, Ms. Grubaugh clarified that the parents' budget drafted in February 2021 did not include child support that Father pays for one of his other children or his $400.00 monthly truck payment. Father admitted that he owed $14,000.00 on the truck and acknowledged that his plan to allow the vehicle's repossession was not a wise financial decision. Under the circumstances of this case, we, like the trial court, conclude that Mother and Father failed to establish a suitable home for the children. This ground was proven by clear and convincing evidence.

*Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing

---

[5] Ms. Grubaugh also testified that the dirty clothing on the parents' floor and Mother's personal hygiene in the months preceding the trial caused concern.

- 10 -

proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied.

*Id*. at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App 2001) (footnotes omitted)).

The record before us reveals that, at least from the time Brittany was born, Mother and Father failed to manifest an ability to care for these children. "Ability focuses on the parent's lifestyle and circumstances." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)). Ms. Gentry's testimony details how the Sevier County Health Department helped Mother parent the children when they were infants for approximately one year.[6] In Ms. Gentry's view, Mother was resistant to her suggestions. Of the times Ms. Gentry was present and Father was not at work, he stayed in his room. Despite services from Ms. Gentry for approximately one year, the parents lost custody for failing to remedy the environmental issues affecting the children. Evidence in the record shows that Mother looked to others to assist her when visiting with the children following their removal. After facing the setback of losing the home they had lived in for six months following the children's removal, Mother and Father took themselves out of the picture and moved to South Carolina. Father did not visit the children between July 2019 and January 27, 2020, which calls into question his willingness to parent them. In her testimony, Ms. Grubaugh

---

[6] At first, Ms. Gentry visited the family once a month. After DCS entered the case, Ms. Gentry visited the family weekly for three months "to try and get them services [and to] get them to where they needed to be."

- 11 -

noted that, while they were in South Carolina, neither parent inquired how the children were doing or about the children's therapy and doctor's appointments. As detailed above, neither parent could maintain stability in housing and there were issues with basic hygiene.

On appeal, both parents argue that, even assuming the first element of this termination ground is met, DCS offered no evidence that returning the children to their custody would pose a risk of substantial harm to either child. We, however, agree with the trial court's assessment of the evidence regarding the element of substantial harm:

> Placing the children into the parents' home at this point would pose a risk of substantial harm to both the physical and psychological welfare of the children. This is not just a speculative type of harm, but a real risk of harm for the children. The children have been with the same foster care parents for 26 months. They have an extremely excellent relationship with them. Their needs have been met. They've had great stability there. In contrast, they would be going back to a place that was totally unstable versus being where they are and having the love of the foster care parents day in and day out. While their parents do not always take advantage of both of the visitations they are offered each month, the foster parents prioritize the children at every avenue including on weekends, on weekdays, and on weeknights. The foster parents take them to daycare. The foster parents have the children on a schedule and foster mother testified that there are behavioral issues when they get lax with the schedule on the weekends sometimes. The foster parents see that the children's needs are met from food to a safe place to sleep, to nourishment, and companionship. Foster mother also testified that the girls call her and her husband Mommy and Daddy. Brittany was approximately five months old when she was removed from the parents' custody and Caroline was still very young as well. The foster parents are now who both children know as their parents.

At trial, the foster mother's testimony and photographic evidence indicated that the children are bonded with their extended foster family as well. Considering the strong bond established between the foster parents and the children as well as the children's success under their care, we affirm the trial court's finding that the return of the children to the parents' custody would pose a risk of substantial harm to their welfare. We conclude that DCS proved by clear and convincing evidence that Mother and Father each failed to manifest both an ability and willingness to assume custody or financial responsibility of the children and that placing them in their care would pose a risk of substantial harm to the physical or psychological welfare of the children.

*Persistence of Conditions*

"Persistence of conditions" may be established as a ground for termination of parental rights when:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. The statute does not require that only the original conditions leading to removal be used to establish grounds for termination. On the contrary, the statute specifically includes both "[t]he conditions that led to the child's removal . . . or other conditions [ ] that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). "A parent's continued inability to provide fundamental care to a child,

even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d at 605 (omission in original) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). When DCS's efforts to help "improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (citing *In re A.R.*, 2008 WL 4613576, at *20).

Here, the children were removed from Mother and Father by order entered November 29, 2018. The children were adjudicated dependent and neglected. The termination of parental rights hearing was held more than six months after the children's removal. As discussed above, neither parent established *stability* in a suitable home—something fundamental to these young children's care. The trial court found:

> Housing was the main issue for removal in this case. As the case has gone on, the longest the parents have lived in any one residence was six months in 2019. Although [Father] testified that all of the hotels and homes where he and [Mother] have stayed since November 2018 have been clean and appropriate, the Court notes that they never lived in any of those places for very long. [Mother] also testified to staying with a friend or cousin in South Carolina and that DCS became involved in that home due to roaches or bugs in the home. The parents have known that they had to show that they could maintain a home. . . .

> There is little chance that these conditions will be remedied soon so that the children can return safely to the home. The parents have had 26 months to demonstrate suitable and stable housing and that they can maintain it. They just got new housing approximately two and a half weeks ago. They would need to show that they could maintain this housing for several months, yet there are already concerns with their ability to afford this housing long-term due to the recent budget that was missing significant payments that the parents are responsible for every month. [Father] also showed little concern that his truck may be getting repossessed soon and that he still owes $14,000 on the loan.

- 14 -

The evidence in the record does not preponderate against these findings. By the time of trial, Mother and Father's new apartment was, by all accounts, much more sanitary than the removal home. It also had appropriate furnishings and basic supplies for the children. However, the cost of the parents' new apartment relative to an accurate accounting of their expenses fairly called into question their ability to maintain the apartment and thus provide the stability required for the children to be safely returned to their care in the near future. With the foregoing considerations in mind, and also considering the length of time the children have been in DCS's custody, we affirm the trial court's finding that continuation of the parent-child relationships between Mother, Father, and the children would greatly diminish their opportunity to be integrated into the safe, stable, and permanent home of their foster parents who wish to adopt them.

We have determined that there is clear and convincing evidence sufficient to prove the ground of persistence of conditions, Tennessee Code Annotated section 36-1-113(g)(3). Accordingly, we affirm the trial court's judgment terminating Mother and Father's parental rights based upon this ground.

*Substantial Noncompliance with the Permanency Plan*

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To terminate parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H*., No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id*. (citation omitted). When determining whether a parent's noncompliance with a plan was substantial, the court must do more than "count[] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H*., 483 S.W.3d at 537. DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B*., 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548–59; *In re Z.J.S*., No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

Here, neither parent challenges the trial court's finding that Mother and Father's responsibilities under the parenting plans "were reasonable and related to the conditions necessitating foster care." We agree with the trial court on this point. Each parent satisfied many of the requirements of the permanency plans including: clinical parenting assessment, psychological evaluation, Youth Villages parenting education, homemaker skills course, and couples counseling. "Improvements in compliance are construed in favor of the parent." *In re Bonnie L*., No. M2014-01576-COA-R3-PT, 2015 WL

3661868, at *8 (Tenn. Ct. App. June 12, 2015) (citing *In re Valentine*, 79 S.W.3d at 549). At trial, Ms. Grubaugh acknowledged that Mother and Father completed many of the permanency plan requirements over the previous two years. However, she noted that neither parent ever maintained all of those requirements at one time. We "determine compliance in light of the permanency plan's important goals." *In re Bonnie L.*, 2015 WL 3661868, at *8. This Court has previously explained:

> As we see it, the compliance required with a permanency plan is that which is necessary to overcome the reasons that children are removed from a parent and placed in foster care. Regaining custody requires parents to complete certain tasks and maintain compliance with the plan to the point that it is appropriate and safe to return the children to them. In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where "return to parent" is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

*In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). The most important permanency plan requirement was for the parents to "obtain and maintain clean, safe, and appropriate housing." Mother had turned down a housing unit that had previously become available. A few weeks before trial, the parents at last obtained a clean, safe, and appropriate apartment. In her testimony, Ms. Grubaugh questioned whether the parents could maintain the apartment, opining, "while it should be stable housing, I don't know if it will be stable housing."

The evidence does not preponderate against the trial court's findings that Mother and Father did not meet the overall goals of the permanency plans and that they did not "provide proof they could *maintain* suitable housing" (emphasis added). As will be discussed below, Father also fell short of the permanency plan's visitation requirements. We affirm the trial court's determination that the evidence clearly and convincingly established that Mother and Father were in substantial noncompliance with the permanency plans.

### Abandonment by Failure to Visit

Parental rights may be terminated for abandonment, as defined in Tennessee Code Annotated section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). As relevant here, abandonment can be found when a parent fails to visit a child for a period of four

consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute requires that parents offer their children more than "token visitation," defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

A parent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to visit was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). The burden is on the parent asserting the affirmative defense to prove by a preponderance of the evidence that his or her failure to visit the children was not willful. *Id.*; *In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042 at *5 (Tenn. Ct. App. Nov. 26, 2019).

Here, DCS filed the petition on January 29, 2020, so the relevant four-month period is September 29, 2019, to January 28, 2020. *See In re Jacob C.H.*, No. E2013-00587-COA- R3-PT, 2014 WL 689085 at *6 (Tenn. Ct. App. Feb. 20, 2014) (statutory four-month period covers four months preceding day termination petition was filed and does not include day petition was filed). It is undisputed that after July 16, 2019, Father failed to visit his children for over six months, and then completed a four-hour therapeutic visit on January 27, 2020, the day before the end of the relevant four-month period. Father raised lack of willfulness as an affirmative defense in his answer, but did not argue it at trial or on appeal.

Father was aware that failure to visit the children could result in the termination of his parental rights because he reviewed and signed the Criteria and Procedures for Termination of Parental Rights form on December 11, 2018. Father failed to remain in contact with DCS once he moved four hours away from the children to South Carolina. He testified, "thinking about it now, I should have, you know, just stayed in Tennessee and fight to get the girls back instead of, you know, up and leaving." The testimony established that before moving to South Carolina, Father enjoyed regular and unsupervised visitation with the children except for a period after May 2019 when visits were suspended until the parents could treat head lice. Because of the abruptness of Father's move, the visitation became supervised. We hold that Father's single visit during the relevant four-month period is token visitation under the circumstances of this case. Tenn. Code Ann. § 36-1-102(1)(C).

We affirm the trial court's determination that the evidence clearly and convincingly established that Father abandoned the children by failure to visit. We affirm the trial court's judgment terminating Father's parental rights on this ground.

## B.
### *Best Interest of the Children*

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination of Mother and Father's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. In making this determination, we are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[7] "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In making the best interest determination, the trial court relied on each parent's historic inability to maintain safe and stable housing; Father's six-month lapse in visitation and disappearance from DCS's radar; evidence that, over the course of the case,

---

[7] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, inter alia, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed before the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute apply here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

the parents rarely attended both monthly visits with the children; and evidence that both parents had failed "to follow through and make[] the children a priority." *See* Tenn. Code Ann. § 36-1-113(i)(1), (3), (6), & (7). The trial court fairly considered "what type of mental and emotional status it is for parents to have multiple [other] children and then not have custody of any of them." *See* Tenn. Code Ann. § 36-1-113(i)(8). Also, the trial court contemplated the effect on the children if they were to be removed from the foster parents' home, finding:

> Factor number five [is] the effect that a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition. The effect would be extreme and detrimental. Going from the stability and the feeling of being loved, cared for, nurtured, having a safe bed, and a safe home where they are currently with the foster parents as opposed to what they had with the parents, that would be weighed very heavily against a return to parent and weigh heavily in the favor of staying where they are with the foster parents.

*See* Tenn. Code Ann. § 36-1-113(i)(5).

Overall, the evidence does not preponderate against the trial court's factual findings on the statutory factors. By the time the parents established a safe, suitable home for the children, they had been in DCS's custody and living in the foster home for over two years.[8] Even then, it seemed unlikely that the parents could maintain the home long-term. The children do not talk about Mother and Father, and their behavior at daycare worsens after visitation with them. The foster mother's testimony and other evidence in the record shows that the children currently enjoy a stable, loving, cheerful, and enriched environment where both foster parents always meet their needs. Ms. Grubaugh testified that the children are very bonded to their foster parents. The foster mother stated that the children call her "mommy" and call her husband "daddy." The foster parents plan to adopt the children if they become available for adoption.

We conclude that the record supports the trial court's findings concerning the children's best interests and that the evidence clearly and convincingly demonstrates that it is in their best interests to terminate Mother and Father's parental rights.

---

[8] Brittany was only six months old when she was placed with the foster family.

## V.    CONCLUSION

The judgment of the trial court is affirmed.  The termination of Sherry R.'s and Jerry L. R., Jr.'s parental rights is affirmed.  The case is remanded for such further proceedings as may be necessary and consistent with this Opinion.  Costs of the appeal are taxed to the appellants, Sherry R. and Jerry L. R., Jr.

_____
JOHN W. McCLARTY, JUDGE